**Broderick ROETTGER, Appellant,**

v.

**COMMISSIONER OF PUBLIC SAFETY, Respondent.**

No. C1–01–328.

Court of Appeals of Minnesota.

Sept. 11, 2001.

Steven J. Meshbesher, Rory Patrick Durkin, Meshbesher & Associates, P.A., Minneapolis, MN, (for appellant).

Mike Hatch, Minnesota Attorney General, Sheila M. Fitzgerald, Assistant Minnesota Attorney General, St. Paul, MN, (for respondent).

Considered and decided by PETERSON, Presiding Judge, AMUNDSON, Judge and ANDERSON, Judge.

## OPINION

G. BARRY ANDERSON, Judge

Appellant challenges the revocation of his driver's license, arguing that the district court (1) clearly erred by finding that the Intoxilyzer machine was in proper working order at the time of appellant's re-test; and (2) erred by concluding that the state met its prima facie burden of establishing that the Intoxilyzer machine was in proper working order and that appellant failed to meet his burden of establishing that the test results were inaccurate or unreliable. We affirm.

## FACTS

At approximately 1:00 a.m. on July 15, 2000, Stillwater Police Officer Bradley Allen arrested appellant Broderick Mark Roettger for driving under the influence of alcohol. Allen read appellant the Minnesota Implied Consent Advisory, and appellant agreed to submit to an Intoxilyzer breath test. Allen is a Certified Intoxilyzer Operator with five years' experience.

Allen transported appellant to the Washington County Police Department and parked his squad car in the "sally port," an enclosed area similar to a garage. The sally port is adjacent to the detainee intake room where the Intoxilyzer machine is located. After bringing appellant to the

intake room, Allen administered two Intoxilyzer tests. The first test was successful. Appellant gave an initial adequate sample, which registered a reported value of .116. During the second test, but before appellant provided a breath sample, the Intoxilyzer machine terminated the test due to "radio frequency interference" (RFI). Allen testified that a state patrol squad car entered the sally port prior to the second test, and that he suspected that squad car radio transmission may have caused the RFI. Allen testified that while operating an Intoxilyzer machine two years earlier, a state patrol squad car, upon entering the sally port, emitted RFI that caused the machine to shut down. Allen, believing that the state patrol squad car caused the RFI, waited for the officer to exit his vehicle before beginning the re-test. After the re-test was completed, Allen asked the state patrol officer if he was transmitting when entering the sally port; the officer confirmed that he had been transmitting as he entered the garage.

During the re-test, the Intoxilyzer machine performed successful internal-diagnostic, air-blank, and calibration-standard tests. According to Allen, however, appellant refused to exhale steadily during the test, which resulted in 34 false attempts to provide a minimum adequate breath sample. Allen's notes, completed during the re-test, corroborate his testimony. Eventually, the Intoxilyzer machine analyzed two acceptable breath samples for a final reported value of .10. The Intoxilyzer machine did not detect RFI during the re-test.

At the implied-consent hearing held pursuant to Minn.Stat. § 169 .123 (1998), both appellant and the state presented expert testimony as to the reliability of the Intoxilyzer test results. Appellant's expert, Thomas Burr, a forensic scientist, attacked the validity of the test results on two grounds. First, Burr stated that Allen did not follow the procedures set forth by the Bureau of Criminal Apprehension (BCA) for eliminating RFI, which recommend that an officer "remove the source of the radio transmissions or move [the] Intoxilyzer to a different location" after detecting RFI during the administration of an Intoxilyzer test. Burr suggested that Allen's failure to follow proper procedures rendered the test results unreliable.

Second, Burr testified that RFI can cause inaccurate test results because it affects the scientific components of the machine. Burr stated that he has been able to operate an Intoxilyzer machine in the presence of RFI and record a false reading. As a result, Burr testified that the test results were unreliable. Burr, however, conceded that the machine he used to conduct his tests was an older series 66 model, not the series 68 model used to test appellant. But Burr contended that the scientific components are the same on both machines. Burr also stated that he did not have any supporting scientific study or research to support his conclusions.

The state introduced testimony from Sara Leach, a forensic scientist at the BCA. Leach testified that she had been trained on the Intoxilyzer machine used in this case, and concluded that the machine's RFI detection feature "makes it impossible for the test to be completed once [RFI has] been detected; therefore you know that the results are actually accurate." Leach stated that, in her opinion, appellant's test results were valid and accurate. She noted that the diagnostic, calibration-standard, and air-blank tests were within the acceptable ranges and that the specific machine in question had no problems with RFI one month prior to appellant's test and one month after appellant's test. Leach also stated that Allen complied with

BCA procedures when he completed the re-test. Leach noted that the Intoxilyzer machine did not detect RFI during the re-test.

The district court sustained the revocation of appellant's driving privileges, finding that the state met its prima facie burden of establishing that the Intoxilyzer machine was in proper working order and that appellant failed to meet his burden of establishing that the re-test administered by Allen was inaccurate or unreliable. This appeal follows.

## ISSUES

I. Did the district court clearly err by finding that the Intoxilyzer machine was working properly at the time of appellant's re-test?

II. Did the district court err by concluding that appellant failed to meet his burden of showing that the Intoxilyzer test results were inaccurate and unreliable?

## ANALYSIS

### I.

■ Appellant first argues that the district court clearly erred by finding that the Intoxilyzer machine was in proper working order at the time of appellant's re-test. District court findings will be sustained unless they are clearly erroneous. Minn. R. Civ. P. 52.01. "Findings of fact are clearly erroneous only if the reviewing court is left with the definite and firm conviction that a mistake has been made." *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn.1999) (quotation omitted). The appellate court views the evidence in the light most favorable to the factual findings and assumes the factfinder believed the state's witnesses and disbelieved contrary evidence. *State v. Atkins*, 543 N.W.2d 642, 646 (Minn.1996). The

district court's conclusions of law will not be reversed absent an erroneous view of the law. *Fritzke v. Comm'r of Pub. Safety*, 373 N.W.2d 649, 650 (Minn.App.1985).

Appellant argues that the record shows that (1) RFI was present in the test environment; (2) RFI voided the second test; (3) RFI can interfere with an Intoxilyzer machine's operation causing a higher or lower reading; and (4) Allen did not, during the re-test, follow the procedural safeguards that ensure the absence of RFI.

■ But there is ample evidence in the record to support the district court's finding. The state introduced testimony from Leach, a forensic scientist, who stated that if there were RFI present during the administration of an Intoxilyzer test, the machine will automatically shut down. Leach further testified that Allen complied with the BCA recommendations regarding the detection of RFI; the evidence showed that Allen (1) located and removed the source of RFI, the state patrol squad car; (2) waited until the officer exited his vehicle before beginning the re-test; and by (3) confirmed that the state patrol officer had been transmitting when he entered the sally port.

Although appellant's expert introduced conflicting evidence suggesting that the Intoxilyzer machine was not in proper working order during the re-test, he conceded that he did not conduct his tests on the same machine appellant used and did not have other scientific studies or research to support his conclusions. The district court, faced with conflicting testimony and in the best position to assess the weight and credibility of the witnesses' testimony, resolved the conflict in the state's favor. We generally defer to such determinations. Minn. R. Civ. P. 52.01; *Frost v. Comm'r of Pub. Safety*, 348 N.W.2d 803, 804 (Minn. App.1984). Because we view the evidence

in the light most favorable to the findings, and because we are satisfied that no mistake has been made, we conclude that the district court did not clearly err by finding that the Intoxilyzer machine was in proper working order at the time of appellant's re-test.

## II.

Appellant next challenges the reliability of the Intoxilyzer test results. A chemical test's proponent must demonstrate that the test is reliable and administered in conformance with the procedures necessary to ensure its reliability. *State v. Dille,* 258 N.W.2d 565, 567 (Minn.1977). The results of an Intoxilyzer machine are admissible as a trustworthy and reliable measure of breath alcohol if the test is performed by a properly certified operator. Minn.Stat. § 634.16 (2000); *Bond v. Comm'r of Pub. Safety,* 570 N.W.2d 804, 806 (Minn.App.1997). When the prima facie requirements are met, it is incumbent on the opponent of the test to demonstrate why it is untrustworthy. *Bond,* 570 N.W.2d at 806. Although the ultimate burden of proof remains with the proponent, the test's opponent must provide more than speculation to demonstrate invalidity. *Hager v. Comm'r of Pub. Safety,* 382 N.W.2d 907, 909 (Minn.App.1986).

### A. *Prima Facie Evidence of Trustworthiness*

Appellant argues that because the district court relied on an erroneous finding that the Intoxilyzer machine was in proper working order at the time of appellant's re-test, the state did not establish a prima facie case that the Intoxilyzer test was trustworthy, accurate, and reliable. We have concluded, however, that the district court's finding was not clearly erroneous. Moreover, the state established that a Certified Intoxilyzer Operator adminis-

tered the test, the air-blank and calibration-standard test results were within acceptable ranges, and that Allen had no reason to believe that the test results were invalid. Importantly, the Intoxilyzer did not shut down or indicate RFI as it did during the first test. We conclude that the district court did not err by determining that the state made a prima facie showing of reliability.

### B. *BCA Recommendations*

Appellant next argues that the Intoxilyzer test results were not reliable because Allen failed to follow BCA recommendations. As support, appellant points to Allen's testimony that he was instructed to begin another test after detecting RFI, which conflicts with BCA recommendations that when an operator detects RFI, the operator should remove the source of the radio transmission or move the Intoxilyzer to a different location. Although Allen may have been given different instructions as to the operation of the Intoxilyzer machine after detecting RFI, a review of the record shows that Allen essentially followed the BCA recommendations. Allen testified that, based on his past experience, he determined a radio to be the source of the RFI and waited until the radio was turned off before beginning the re-test. The state's expert concluded that this was sufficient compliance with the BCA recommendations. The better practice would have been to confirm that the state patrol officer had been transmitting when entering the sally port before beginning the re-test, but the failure to do so hardly makes the subsequent re-test unreliable. We conclude that the district court did not err by refusing to find the re-test unreliable based on appellant's contention that Allen failed to follow BCA recommendations.

Appellant next argues that the facts of this case support test invalidation under

*McGregor v. Comm'r of Pub. Safety,* 386 N.W.2d 339 (Minn.App.1986). In *McGregor,* the arresting officer testified that she observed the driver for 15 minutes prior to the Intoxilyzer test, but did not know the purpose of observation or what she should have been observing. *Id.* at 340. This court stated that "[u]nder the extreme facts" of that case, the commissioner did not meet his burden of establishing a prima facie showing of reliability. *Id.* at 341. Appellant argues that because Allen testified that he was instructed to begin another test when RFI was detected, which conflicts with the BCA recommendations, extreme facts exist in this case that should invalidate the test results.

But *McGregor* is distinguishable. Unlike the arresting officer in *McGregor,* Allen is a Certified Intoxilyzer Operator with five years of experience. Although Allen testified that he was instructed to begin a second test after detecting RFI, he also stated that he complied with the BCA recommendations. His testimony is supported by testimony from the state's expert. We are not faced with "extreme facts" similar to *McGregor* and therefore reject appellant's contention.

### C. Burden to Rebut Prima Facie Evidence of Trustworthiness

■ Finally, appellant argues the testimony given by his expert witness, a distinguished forensic scientist, proved the unreliability of the Intoxilyzer test results. Appellant points to testimony from Mr. Burr, who stated: (1) RFI can interfere with the Intoxilyzer's scientific components causing the machine to give a higher or lower alcohol reading; (2) he was able to operate an Intoxilyzer machine in the presence of RFI and get a false reading; and (3) the number 34, referenced on line five of appellant's Intoxilyzer test record, evidences the presence of RFI. But appellant's expert conceded that his own experiments were conducted with an older series 66 model, not the series 68 model used to test appellant, and he admitted that he had no other scientific evidence to support his assertion that RFI can interfere with the Intoxilyzer's components causing the machine to give a higher alcohol reading. To the contrary, the state's expert testified that the Intoxilyzer machine will automatically shut down if RFI is detected. Moreover, Allen explained that the number 34 on line five of the Intoxilyzer test records indicated the number of breaths appellant took when blowing into the machine. Allen testified that appellant would not breathe steadily into the machine, which resulted in 34 unsuccessful breath samples. Allen made a written note on the test result form that appellant refused to exhale steadily. Significantly, the Intoxilyzer machine did not detect RFI during the re-test. Because appellant brought forth only speculative evidence suggesting that RFI interfered with appellant's re-test, we conclude that the district court did not err by concluding that appellant did not meet his burden of demonstrating that the Intoxilyzer test results were unreliable or untrustworthy. *See Bond,* 570 N.W.2d at 807 (stating prima facie evidence of reliability not rebutted where opponent of test result merely speculates as to possible problem with test).

### DECISION

The district court did not clearly err by finding that the Intoxilyzer machine was in proper working order at the time of appellant's re-test. The district court did not err as a matter of law by concluding that appellant did not meet his burden of demonstrating that the Intoxilyzer test results were unreliable or untrustworthy.

**Affirmed.**